# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MARK WALKER**, | Case No. 3:22-cv-1011-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UNION PACIFIC RAILROAD COMPANY**, | |
| Defendant. | |

Anthony S. Petru and Gavin Barney, HILDEBRAND MCLEOD & NELSON, LLP, 5335 College Avenue, Suite 5A, Oakland, CA 94618; and James H. Kaster and Lucas J. Kaster, NICHOLS KASTER, PLLP, 4700 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402. Of Attorneys for Plaintiff.

William H. Walsh, COZEN O'CONNOR, 999 Third Avenue, Suite 1900, Seattle, WA 98104; Christopher Sean Hennessy, COZEN O'CONNOR, 123 N Wacker Drive, Suite 1800, Chicago, IL 60606; and Scott P. Moore, BAIRD HOLM LLP, 1700 Farnam Street, Suite 1500, Omaha, NE 68102. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Mark Walker ("Walker") worked as a locomotive engineer for Defendant Union

Pacific Railroad Company ("Union Pacific") from approximately 2005 through 2019. After the

Court dismissed Walker's claim under the Americans with Disabilities Act ("ADA") alleging

failure to accommodate, Walker's remaining claims allege disparate treatment and disparate

impact in violation of the ADA. Walker contends that Union Pacific "regarded" Walker as

disabled by having a color vision deficiency. Walker alleges that Union Pacific violated the

ADA by requiring Walker to take a secondary color vision field test ("CVFT"), Union Pacific's

proprietary "Light Cannon" test, even though Walker had just passed a scientific color vision

test, the "Ishihara" test. Walker also alleges that Union Pacific violated the ADA because the

specific version of Union Pacific's proprietary Light Cannon test that was administered to

Walker in July 2019 did not effectively assess an employee's ability to read and interpret railroad

signals because that test screens out qualified individuals who do not, in fact, have color vision

deficiencies but whom the test, and thus Union Pacific, wrongfully "regards" as being color

vision deficient. The Court previously has determined as a matter of law that Walker is a

qualified individual, meaning he could perform all his essential job functions, including

discerning colors in wayside signals. *See* ECF 30, 37. Union Pacific, however, asserts the

affirmative defenses of business necessity and direct threat.[1] The Court has set a jury trial to

begin on February 10, 2025.

---

[1] Union Pacific's affirmative defenses of direct threat and business necessity are based on its purported policy of requiring that an employee who currently passed but at any previous time failed an Ishihara color vision test must nevertheless take and pass Union Pacific's secondary field test, the Light Cannon test. Because taking a secondary test under these circumstances is not mandated by law, this purported policy would be a "qualification standard" imposed by Union Pacific. The Court notes that generally to prove these affirmative defenses when an employee alleges that application of a qualification standard tends to screen out qualified persons with disabilities, the employer must show that performance of the job cannot be obtained through a reasonable accommodation. *See* 42 U.S.C. § 12113(a)-(b); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 995-97 (9th Cir. 2007). Because, however, Walker alleges only a "regarded as" claim, the element of reasonable accommodation does not apply to these affirmative defenses in this case. *See* 42 U.S.C. § 12201(h); *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11 & n.13 (6th Cir. 2012); *Munoz v. Union Pac. R.R. Co.*, 2022 WL 4348605, at *8 n.6 (D. Or. Aug. 9, 2022), *report and recommendation adopted*, 2022 WL 4329427 (D. Or. Sept. 16, 2022); *Hoback v. City of Chattanooga*, 2012 WL 3834828, at *5 (E.D. Tenn. Sept. 4, 2012). If either party disagrees with this conclusion, that party may file a brief no later than December 30, 2024, explaining its position and providing appropriate legal authorities.

Now before the Court are the parties' cross motions to exclude or limit expert testimony. Walker moves to exclude or limit the testimony of Union Pacific's expert witnesses Mr. Steven Fender and Dr. Jeff Rabin, O.D., Ph.D. Walker argues that Fender is not qualified to provide expert testimony on any subject relevant to this case and that Fender's testimony is irrelevant and unreliable. Walker contends that because he passed the Ishihara test, is a qualified employee as a matter of law, and the Light Cannon is only a qualification standard, Fender's testimony about regulatory standards is irrelevant. Walker also argues that Fender is unqualified to render any opinion outside of regulatory standards, such as the efficacy of the Light Cannon test, and his opinions about the efficacy of the Light Cannon test are unreliable and unhelpful to the jury. Walker also moves to limit Dr. Rabin's testimony to what is contained in his non-reporting witness disclosure under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

Union Pacific moves to exclude the testimony of Walker's expert witness Jay Neitz, Ph.D. as misleading, confusing, unreliable, and unhelpful to the jury. Union Pacific argues that Dr. Neitz's testimony is misleading because he misinterprets federal regulations by construing the Light Cannon test as a "scientific" test instead of a "field" test. Union Pacific also argues that Dr. Neitz's testimony is unhelpful to the jury because he does not offer any reasonable alternative test. Union Pacific further contends that Dr. Neitz's testimony is unreliable because he did not properly research the information provided by Dr. Rabin, on which Dr. Neitz relies, particularly Dr. Rabin's later deposition testimony regarding changes to the Light Cannon testing procedure that improved the test results and were implemented after Dr. Rabin's earlier report detailing the Light Cannon's original failures.

The Court held a hearing and took testimony offered by Union Pacific from John Holland, M.D., Union Pacific's former Chief Medical Officer; Dr. Rabin; and Fender. Walker

offered the testimony of Dr. Neitz. For the reasons explained below, the Court grants in part and denies in part the parties' motions.

## STANDARDS

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert*"), 509 U.S. 579 (1993), and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2024).

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular . . . field." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995). Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Thus, a witness may be qualified as an expert upon demonstrating at least a "*minimal foundation* of knowledge, skill, and experience." *Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting with emphasis *Thomas*, 42 F.3d at 1269).

When determining the admissibility of expert testimony, a district court's role under Rule 702 is not to be a "fact finder" but a "gatekeeper." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks omitted). To fulfill its role as gatekeeper, a district court must "ensure that the testimony is both relevant and reliable" before it deems such testimony admissible. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (cleaned up). A court's gatekeeping role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702). By acting as a gatekeeper for all proffered expert testimony, a court "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Courts "must ensure that the proposed expert testimony is relevant to the task at hand," which is sometimes referred to as the "fit" requirement. *Daubert II*, 43 F.3d at 1315 (quotation marks omitted). Although the "[t]he relevancy bar is low," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014), to be sufficiently relevant, the expert opinion evidence must "logically advance[] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315; *see also Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (cleaned up)). Rule 702 also requires opinion evidence to be "helpful" to the trier of fact, which is another way of describing a "relevance inquiry." *Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1265 (9th Cir. 2023). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotation

marks omitted). Further, "[u]nder Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). "Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014).

The Ninth Circuit has "repeatedly affirmed that 'an expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law.'" *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter*, 373 F.3d at 1016) (emphasis in *Hangarter*). Accordingly, the Ninth Circuit has affirmed the exclusion of expert testimony when the testimony was intended to instruct the jury about whether the conduct at issue violated a statute, explaining that "[s]uch testimony would, in effect, instruct the jury regarding how it should decide the key question whether [the defendant] violated a statute and thus acted improperly." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008). The "prohibition of opinion testimony on an ultimate issue of law recognizes that, when an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Diaz*, 876 F.3d at 1197 (quotation marks omitted) (emphasis in original).

Despite that general prohibition, Rule 704(a) of the Federal Rules of Evidence provides that an "opinion is not objectionable just because it embraces an ultimate issue." *See also Hangarter*, 373 F.3d at 1016 ("It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." (alteration in *Hangarter*) (quotation marks omitted)). The following example, provided by the Advisory Committee on Evidence Rules, demonstrates how the categorical bar on expert opinions as to legal conclusions, as recognized by the Ninth Circuit

in the cases cited above, is consistent with Rule 704(a): "[Under Rule 704(a)], the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." Fed. R. Evid. 704(a) advisory committee's note to 1972 amendment. Although the first question directly asks for "testimony on an ultimate issue of law," *see Nationwide Transp.*, 523 F.3d at 1059, the second seeks opinions that merely "embrace" that ultimate issue, *see* Fed. R. Civ. P. 704(a).

Turning to the reliability requirement, "[t]he question of reliability probes whether the reasoning or methodology underlying the testimony" is valid. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (quotation marks omitted). "The test of reliability is flexible." *Pomona*, 750 F.3d at 1044. To aid a court's evaluation of reliability, the Supreme Court in *Daubert* "identified four factors that may bear on the analysis: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray*, 870 F.3d at 922 (citing *Daubert*, 509 U.S. at 593-94).

"Concerning the reliability of non-scientific testimony," however, "the '*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.'" *Hangarter*, 373 F.3d at 1017 (emphasis in *Hangarter*) (quoting *U.S. v. Hankey*, 203 F.3d 1160, 1169 (2000)).  The Supreme Court also has confirmed that the *Daubert* factors are "meant to be helpful, not definitive," and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's

particular expertise, and the subject of his testimony." *Kumho Tires*, 526 U.S. at 150, 151.

"[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a

particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.*

at 153 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)); *see also United States v.*

*Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) (stating that the Supreme Court has "refrained

from offering any prescription regarding how the many different kinds of expertise might be

evaluated by trial courts" (cleaned up)).

"[E]xpert testimony may not be admitted unless the proponent demonstrates to the court

that it is more likely than not that the proffered testimony meets the admissibility requirements

set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. "It is the

proponent of the expert who has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell*

*Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the expert's proposed

testimony must be established by a preponderance of the evidence in accordance with

Rule 104(a). *See Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171,

175-76 (1987)). The party presenting the expert must show that the expert's findings are based

on sound principles and, if applicable, that they are capable of independent validation.

*Daubert II*, 43 F.3d at 1316.

## BACKGROUND

### A.  Development of Union Pacific's Light Cannon Test

Under the regulations of the Federal Railroad Administration ("FRA"), railroad

companies must test railroad engineers at least every three years for, among other things, color

vision acuity. *See* 49 C.F.R. § 240.201(c); 240.121(c)(3). The initial test must be one of a set of

scientific tests approved by the FRA, including, as relevant here, the Ishihara 14-plate test

("Ishihara"). *See* 49 C.F.R. § 240, App'x F ("App'x F"). If an engineer fails the initial, or

primary, test, the examinee may undergo a secondary test, which may consist of an ["o]phthalmologic referral, field testing, or other practical color testing." App'x F. Union Pacific chose to have its employees undergo a field test.

The FRA has published guidance for designing field tests. *Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73122 (Nov. 24, 2015) ("Best Practices"). This guidance explains that field tests are different from scientific tests, such as the Ishihara. *Id.* at 73124-25. Scientific tests are validated through scientific rigor, peer review, and the like. *Id.* at 73124. Field tests should be "valid, reliable, and comparable" and must "reasonably match actual operating or working conditions." *Id.* For validity, "a color vision field test is valid to the degree that it assesses whether a person can recognize and distinguish between colors of the types of railroad signals in the yard or on all portions of railroad systems on which the person must perform safely . . . ." *Id.* at 73125. This factor essentially tests "[t]he degree to which a field test's conditions match actual operating conditions." *Id.* "Reliability means the degree of reproducibility of the test results. . . . Comparability means the testing procedures are fairly administered and the test results are uniformly recorded." *Id.*

For many years, Union Pacific used a CVFT involving actual wayside signals. In June 2012, two Union Pacific freight trains collided head-on in Goodwell, Oklahoma, killing two engineers and a conductor, derailing five locomotives and 32 cars, and causing about $14.8 million in property damage. *See, e.g.*, ECF 19-2 at 8. The National Transportation Safety Board ("NTSB") determined in June 2013 that the accident was in part due to an engineer who had color vision deficiencies that had grown over time and were not sufficiently detected by Union Pacific's CVFT. *Id.* at 56-57. The NTSB concluded that Union Pacific's CVFT using only wayside signals "fails to ensure that Union Pacific Railroad employees have adequate color

perception to perform in safety-sensitive positions." *Id.* at 57. The NTSB recommended, among other actions, that Union Pacific "replace [its] color vision field test with a test that has established and acceptable levels of validity, reliability, and comparability to ensure that certified employes in safety-sensitive positions have sufficient color discrimination to perform safely." *Id.* at 61. The NTSB further recommended that after its "replacement color vision field test is implemented, retest all certified Union Pacific Railroad employees in safety-sensitive positions who failed the primary color vision field testing on their last medical certification exam using the new procedure." *Id.*

Union Pacific began developing the Light Cannon test in 2015. In October 2015, Dr. Rabin and Dr. Douglas J. Ivan, M.D., reviewed the Light Cannon test and testing protocol. The 2015 device contained four eight-inch LED lights, in two rows of two, that flashed four colors—red, yellow, green, and white—for five seconds each, and required each color light to be manually turned on and off. The examinee was located one-quarter mile away from the device, with a nurse taking down responses and Union Pacific staff at either end managing the test. After this review, Drs. Rabin and Ivan issued preliminary findings, recommending several changes, including reducing the time shown for each color to two seconds and automating the exposure time, increasing the distance between the examinee and the device to one-half mile (or as a potential alternative, making the device a rotatable cube with one light on each side), and conducting human studies to validate the efficacy of the test. *See*, Union Pac. *Daubert* Ex. No. 6.[2] Dr. Holland explained that Union Pacific incorporated a few of the recommended changes, including making the device a rotating cube showing only a single light, automating the

---

[2] Union Pacific provided exhibits in a notebook at the *Daubert* hearing, which, if not readily located elsewhere in the record, are cited by notebook tab number.

exposure time, and decreasing the exposure time to three seconds (versus two, with the approval of Dr. Rabin), but Union Pacific declined to make the other suggested changes and decided against having human studies undertaken at that time.

Drs. Rabin and Ivan issued their "draft" final report on January 25, 2016.[3] ECF 64-5. This report identified that the Light Cannon test had "a number of critical short comings in its current design and within the proposed test administrative procedures." *Id.* at 4. The report recommended several improvements and "strongly recommended" that before relying on "any CVFT" and "particularly" the Light Cannon test, it "undergo proper scientific and operational validation studies." *Id.* at 5. The report explained that this is because "practical field color vision tests are problematic and not recommended." *Id.*

Union Pacific nevertheless implemented the Light Cannon test on April 1, 2016, with only the few modifications previously described and no further validation studies having been performed. Dr. Holland explained at the hearing that Union Pacific had a team that was involved in designing the Light Cannon test and they decided as a group that human studies, further validation, or further changes were not needed before implementation, despite the strong recommendations by their hired consultants, Drs. Rabin and Ivan. Instead, Union Pacific hired Dr. Rabin approximately two years later to undertake further studies into the efficacy of the Light Cannon test.

Dr. Rabin was hired in approximately mid-2018 to conduct further studies to evaluate the efficacy of the Light Cannon.[4] These were the human studies originally suggested by Drs. Rabin

---

[3] At the hearing, Dr. Holland testified that he does not know why the report is labeled as a "draft" final report when, according to his understanding, it is the final report submitted to Union Pacific by Drs. Ivan and Rabin.

[4] There is some ambiguity regarding Drs. Rabin and Ivan being hired at the end of 2016 for further scientific and operational studies. Dr. Holland generally recalled that they were hired

and Ivan. In 2019 and 2020, Dr. Rabin, assisted by graduate students, conducted studies using known color vision normal persons and known color vision impaired persons. Dr. Rabin and his students compared Union Pacific's original "2019" testing protocol, which had not changed since 2016,[5] with a modified testing protocol. Union Pacific's original testing protocol involved showing the examinee the same color, twice, to orient the examinee before the test. The modified protocol involved showing the examinee all four colors before the test formally began. Union Pacific's original protocol had a 26.5% failure rate in persons known to have no color vision deficiency, meaning that persons who were known to be color vision normal nevertheless failed the Light Cannon field test as it was first implemented. With the modified protocol, however, this failure rate dropped to nearly zero.

Dr. Rabin explained at the hearing that he reported his results with a PowerPoint presentation in approximately August 2020 and one of his graduate students completed a paper in 2022, *Sensitivity and Specificity of a New Signal Light Test*, one chapter of which is in the

---

for such testing at that time. Counsel for Walker questioned Dr. Holland regarding the fact that the legal department sent out a scope of work document because complaints had been lodged by employees that the first implemented version of the Light Cannon test was screening out employees who did not have color vision deficiencies. This information did not refresh Dr. Holland's recollection, who responded that he was only focused on Walker's case. Dr. Rabin, meanwhile, did not recall that he had much involvement in the 2016 testing, believing that at most he may have been involved to review the revised lights. But he did state that no human studies were conducted at that time.

[5] At the hearing, Dr. Holland confirmed that Union Pacific's testing protocol did not change from April 2016 through Dr. Rabin's testing and was only modified in 2020 after Dr. Rabin's report, to implement the suggested modification from the report. Thus, although Dr. Rabin's test report identifies the protocol as the "2019" protocol, it is the same as the 2016 protocol first implemented by Union Pacific and used until the 2020 changes were implemented. Walker's test in July 2019, however, deviated from Union Pacific's "original" testing protocol. Instead of being shown two identical lights before the test, Walker was shown two different lights, yellow and white.

record. ECF 72-4.[6] At the request of Union Pacific, this paper is awaiting peer review for publication until after the conclusion of litigation relating to the Light Cannon test.[7] Dr. Rabin testified at deposition, and confirmed at the hearing, that based on the new testing protocols and other changes made to the Light Cannon test after his 2016 report, he believes the 2020 version of Light Cannon test is a valid field test. Dr. Rabin noted, however, that for *people with color deficiencies*, he believes the change in testing protocols did not make a statistically significant difference, particularly given that his testing involved a range of color vision deficiencies and he believes that railroad engineers would have a narrower degree of color vision deficiencies to begin with. But he reiterated his belief that the test needed human subject testing to be valid. The only test he believes meets all the criteria for validity is the 2020 version of the Light Cannon.

## B.  Plaintiff John Walker

Walker was hired by Union Pacific in 2003, and he passed the Ishihara at that time. *See* ECF 23-21 at 22-23. He was certified as an engineer in 2005 and he again passed the Ishihara. *See* ECF 23-22 at 2-3. In 2007 he passed the Ishihara again as part of his recertification as an engineer. *See* ECF 23-23 at 2-3. In 2010, Walker failed the Ishihara test after incorrectly identifying two plates. *See* ECF 23-24 at 5. Walker was recertified as an engineer, however, after

---

[6] The Court notes that this document begins with Bates UP-BLANKINSHIP-001362, and contains no identifying information. Dr. Neitz recites in his report that he reviewed a document "entitled *Sensitivity and Specificity of a New Signal Light Test*, by Jeff Rabin, OD, PhD, and colleagues, labeled UP-BLANKINSHIP-001316-001361." The Court could not locate that document in the record. Thus, the authorship of this document is unclear.

[7] Dr. Rabin explained that this paper had undergone internal peer review by a five person committee so that the graduate student could receive her Ph.D. and was awaiting further peer review for publication in a journal.

he passed Union Pacific's then-current wayside signal CVFT.[8] In 2013, Walker again failed the

Ishihara by incorrectly identifying two plates. ECF 23-25 at 3. Again, Walker was recertified

after passing Union Pacific's wayside signal CVFT. ECF 23-27 at 2. Walker passed the Ishihara

on June 20, 2016. ECF 23-28 at 2. He again passed the Ishihara on June 21, 2019. ECF 23-4 at 7.

On July 3, 2019, Union Pacific's Associate Medical Director, Dr. Donald Richard Lewis, stated

that Walker had met the FRA's vision requirements and was approved for recertification.

ECF 23-29 at 6. Nonetheless, two days later, Walker's file was flagged as "not approved" for

safety sensitive work. *Id.* Dr. Holland had intervened to require Walker to undergo secondary

testing with Union Pacific's Light Cannon test, based on Walker's previous Ishihara failures

in 2010 and 2013. *See id.* at 5; ECF 23-31. On July 8, 2019, Walker took and failed Union

Pacific's Light Cannon test. ECF 23-31. Based on this failure, Union Pacific determined that

Walker could not work in a position requiring accurate color signal recognition, and thus he

could not work in his current position. ECF 23-32.

　　　　In April 2016, after Union Pacific implemented the Light Cannon test, Walker was an

employee who had "failed the primary color vision field testing on [his] last medical certification

exam" (his 2013 Ishihara test), but Union Pacific did not retest him using the Light Cannon test

despite the recommendation of the NTSB. Indeed, when Walker passed the Ishihara in

June 2016, Union Pacific still did not make Walker take the Light Cannon secondary field test.

Not until Walker failed the Ishihara in June 2019 did Union Pacific require him to take the Light

Cannon secondary CVFT.

---

[8] Both parties cite this as a fact in their summary judgment motions and Union Pacific cites this fact in its briefing in these underlying motions. The parties, however, do not cite record evidence supporting this fact and the Court could find none. This fact, however, is undisputed.

**DISCUSSION**

**A.  Walker's Motion Challenging Fender**

Fender is a Railroad Transportation and Safety Consultant who has worked in the industry for 45 years. He worked for 31 years at the FRA. He is highly qualified in the fields of railroad operations, safety, and regulations.

Walker argues that Fender's opinion that the Light Cannon test "complied" with the FRA regulations is irrelevant. Walker also contends that with this opinion out as irrelevant, Fender is not qualified to opine about his remaining opinions, particularly about the "efficacy" of the Light Cannon test. Walker also asserts that Fender's opinions other than those related to the FRA regulatory framework (which are irrelevant) are unreliable and not helpful to a jury.

For Walker's first argument, Walker relies on the Court's Order adopting the Findings and Recommendation resolving the parties' motions for summary judgment. Walker contends that Fender's opinion that the Light Cannon test is in compliance with the rules and regulations of the FRA is irrelevant to this case because the Court ruled at summary judgment that Union Pacific did not have to subject Walker to the Light Cannon test under FRA regulations, and may even have been precluded from doing so under the regulations. Union Pacific responds that Fender's opinions regarding the Light Cannon's compliance with FRA rules and regulations is relevant and helpful to the jury, although Union Pacific does not explain how it is relevant or helpful given the Court's opinion at summary judgment.

The details of the FRA's rules and regulations governing mandatory secondary field tests have a lower probative value in this case because of the Court's opinion at summary judgment. Regardless of the Court's summary judgment opinion, however, to the extent Fender's testimony is intended to explain FRA rules and regulations regarding color vision acuity testing to the jury or opine that the Light Cannon was compliant with FRA rules and regulations, such testimony is

improper. The Court can instruct the jury as to the legal requirements of the FRA, to the extent

they are relevant. Further, whether the Light Cannon is "compliant" with the FRA, to the extent

that may be relevant, is a legal conclusion and not a proper topic for expert testimony. *See, e.g.*,

*Nationwide Transp.*, 523 F.3d at 1059; *Diaz*, 876 F.3d at 1197; *see also Magallon v. Robert Half

Int'l, Inc.*, --- F. Supp. 3d ---, 2024 WL 3594474, at *7 (D. Or. July 31, 2024) ("Here, the Court

will not permit either party's expert witness to opine about whether RHI did or did not violate

FCRA or whether RHI's practices were 'FCRA compliant.'"). For the same reasons, Fender may

not opine that requiring Walker to take the Light Cannon test after he passed the Ishihara test

was compliant with or permitted under FRA rules and regulations. *See* Expert Report of Steven

Fender at 6-7 (ECF 70-1 at 10-11) ("Once an examinee fails a test listed in Appendix F, or as in

this case, the CMO determines a need to further examine the subject employee, they 'may be

further evaluated as determined by the railroad's medical examiner.' . . . . The CMO of the

railroad has discretion on how to develop the UP program and conduct further testing after the

Ishihara test is failed or otherwise.").

      Regarding the remaining portions of Fender's opinion, the Court addresses each portion

in turn. First, Fender may not opine about how Walker's case compares to cases presented to the

Locomotive Engineer Review Board or the Operating Crew Review Board, or that the Light

Cannon test is in compliance with FRA rules and regulations per the decisions of those review

boards. Such a discussion is of minimal relevance and is unduly prejudicial and potentially

confusing to the jury. *Cf. Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1015 (9th Cir. 1999)

(explaining, in the context of civil rights complaints, that "[t]here is a much greater risk of unfair

prejudice involved in introducing a final agency ruling" versus a preliminary finding because

juries might have difficulty in independently evaluating evidence "after being informed of the

investigating agency's final results" and thus courts must undertake a Rule 403 analysis); *M.A.C. v. City of Los Angeles*, 2018 WL 6173383, at *2 (C.D. Cal. Jan. 24, 2018) ("The Court agrees that any agency or board conclusions as to the reasonableness of the officer's conduct at the time of the fatal shooting are irrelevant and unduly prejudicial; that is the very inquiry the jury is tasked with resolving, and evidence of such agency decisions would mislead the jury and confuse the issues . . . .").

Walker's next challenge relates to Fender's opinion regarding the efficacy of the Light Cannon test. Walker argues that Fender is unqualified to render this opinion, and that the opinion is unreliable and unhelpful. Fender spent decades working in railroad operations and safety. He explained at the hearing that he had frequent exposure to railroad signals. He also saw the Light Cannon test in operation. Fender is qualified to opine as to whether the Light Cannon test was "valid" as that term is used in the Best Practices—meaning that the test reasonably matched real world operating or working conditions.[9] Fender also may opine about the efficacy of the test, or its "job-relatedness," meaning whether it "fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007). The key question, however, is whether Fender's opinion on these issues is reliable and helpful.

---

[9] As noted above, validity in the context of field tests means how well it matches operating or working conditions. In the context of field tests, the Court does not construe that the experts are intending to testify that the test is "valid" under or "in compliance with" FRA rules and regulations. The Court instead construes "validity" to mean that the test is "valid" as that term is in used in the Best Practices—because it matches actual operating or working conditions. To the extent any expert intends their Best Practices field test "validity" opinion to mean valid under or in compliance with FRA rules and regulations, such testimony is excluded as an improper legal conclusion.

Fender opined generally in his report that the Light Cannon test is "employee friendly" because it shows all four lights to orient the examinee and is "a practical, well-developed, and implemented test which replicates real world conditions." At the hearing, upon questioning by the undersigned judge, Fender unambiguously stated that this opinion referenced the Light Cannon test as of 2020, based on all four colors first being shown to the examinee for orientation purposes. Fender stated that he was not providing an opinion on any other version of the Light Cannon test or testing protocol and emphasized how helpful he believed it was to show all four colors before the test. Although Fender later discussed, in ambiguous terms, a visit to a Union Pacific location in 2018 in which he and his "boss" at the time were shown the Light Cannon, he did not describe that he was shown the testing protocol or any warmup lights, which he repeatedly emphasized was a key part to his finding the 2020 Light Cannon valid.

During Walker's 2019 test, he was not given the 2016 protocol (or the 2019 protocol as it is identified in Dr. Rabin's testing); nor was he given the modified 2020 protocol. Thus, the parties may have to present the evidence of the two tested protocols and argue how the difference in protocol as given to Walker affected the efficacy of the Light Cannon test he received. No expert, however, has been disclosed as offering an expert opinion on that precise issue or hypothetical. Nonetheless, although the post-2020 changes to the Light Cannon test occurred after Walker took his test in 2019, the fact of those changes, the effect of those changes to the efficacy of the Light Cannon, and the experts' opinions about the efficacy of the Light Cannon test after the 2020 changes were implemented provide some probative value to the test taken by Walker, which involved a hybrid protocol between the 2016 and 2020 testing protocols. Thus, the Court finds that Fender's opinion about the efficacy of the 2020 Light Cannon test, even though he repeatedly emphasized the importance of all four colors first being shown to the

examinee, is somewhat helpful to the jury. It also is reliable because Fender has decades of

related experience in the industry and personal experience viewing the Light Cannon test.

Walker, of course, may attack Fender's opinion in cross examination, including the fact that

Walker was not shown all four colors.

The remaining aspects of Fender's opinion also are reliable and potentially helpful to the

jury based on Fender's experience and the issues in this case regarding railroad safety and the

need for color vision acuity. Fender may testify to Union Pacific's general rail business and rail

infrastructure, its importance in the supply chain, and its importance to national security and the

military. He also may testify generally to the complexity and business of the rail lines and Union

Pacific's rail lines, in particular. Fender further generally may describe safety concerns, signaling

systems, and the importance of color vision acuity to signaling systems and safe rail operations.

**B.  Walker's Motion Challenging Dr. Rabin**

Dr. Rabin is a limited expert witness disclosed under Rule 26(a)(2)(C) of the Federal

Rules of Civil Procedure. Accordingly, he did not provide (and was not required to provide) an

expert report. Union Pacific disclosed the topics to which Dr. Rabin would opine as follows:

> Dr. Jeff Rabin is expected to testify regarding the validity of the
> Defendant's Color Vision Field Test ("CVFT") and its compliance
> with Federal Railroad Administration regulations.
>
> Dr. Rabin conducted a validation study of the CVFT and
> concluded that the CVFT is valid and complies with Federal
> Railroad Administration regulations. Dr. Rabin will testify as to
> the facts and opinions of his validation study and the basis on
> which he concluded the CVFT is a valid test and complies with
> FRA regulations.

ECF 66-3 at 3. As an initial matter, the Court holds that, as with Fender, Dr. Rabin may not

testify that the Light Cannon test complies with or is valid under the FRA's rules and

regulations.

PAGE 19 – OPINION AND ORDER

Walker moves to limit Dr. Rabin's direct testimony only to the topics contained in his witness disclosure. The Court grants this aspect of Walker's motion. Dr. Rabin may not testify on issues not included in his witness disclosure. *See Smith v. City of La Verne*, 2024 WL 2106742, at *2 (C.D. Cal. Apr. 30, 2024) ("Again, however, the Court will strictly limit Dr. Aboolian's testimony, and Plaintiff will not be permitted to elicit testimony beyond the limited content of his disclosure [under Rule 26(a)(2)(C)].").

Walker also argues that Union Pacific's disclosure of Dr. Rabin's testimony was "vague" and "high level," thus making it difficult to ascertain about what Dr. Rabin will be testifying. Walker seeks to ensure that Union Pacific does not attempt to have Dr. Rabin testify regarding anything specific to Walker—his color vision acuity, the application of the Light Cannon test with respect to Walker, or his ability to perform his job safely. The Court agrees that these issues are outside the scope of Dr. Rabin's disclosed testimony.

Union Pacific responds that if Walker can have Dr. Rabin testify as to the efficacy or validity of the Light Cannon test as it existed in 2016 when Dr. Rabin did his first evaluation, then Union Pacific should be allowed to elicit Dr. Rabin's testimony about the efficacy or validity of the test after the 2020 changes to the test and the testing protocol. Union Pacific contends that if Walker elicits testimony about the validity of the original test and testing protocol, that will "open the door." The issue of "opening the door" is not ripe at this time. Whether Walker opens the door to any particular testimony will be determined based on his questions at trial. The Court concludes, however, that Union Pacific has sufficiently disclosed its intention to elicit testimony from Dr. Rabin regarding his 2019-20 study of the Light Cannon test.

As noted, Dr. Rabin studied the Light Cannon in 2015 (issuing his 2016 report with Dr. Ivan) and in 2019-20 with graduate students. Although the 2019-20 study was through his university and the paper may have been issued by one of his graduate students, the parties (and other experts) associated that study with Dr. Rabin. It thus is sufficiently disclosed in Union Pacific's Rule 26 disclosure reference to Dr. Rabin's validation study. Therefore, without resolving at this time the issue of whether any door has been opened, Dr. Rabin generally may testify as "disclosed" about his 2015 and 2019-20 studies into the Light Cannon test. The Court, however, still must exercise its gatekeeping role to ensure that Dr. Rabin's testimony will be helpful to the jury.[10]

Dr. Rabin unambiguously stated at the hearing that his opinion that the Light Cannon test is valid is based on the 2020 version and protocol of the test. He noted that the earlier version and protocol of the test would capture persons with color deficiencies the same as the later version of the test, but he would not adopt the "valid" designation without "human studies" to validate the test, which did not occur until the 2020 version. Counsel for Union Pacific argued that Drs. Ivan and Rabin's final report recommending human studies was based on the *initial* 2015 version of the Light Cannon and not on the 2016 version after some of the changes suggested by Drs. Rabin and Ivan were implemented. The "strong" recommendation of human studies, however, was unrelated to the implementation of the changes suggested by Drs. Rabin and Ivan, because as stated in the final report, that recommendation was for *any* CVFT. Thus, Dr. Rabin's demand for human studies was not limited to the 2015 version of the Light Cannon, as shown by his final report and his testimony at the hearing.

---

[10] Dr. Rabin's testing methods and evaluation of the Light Cannon in 2015 and 2019-20 are reliable.

Counsel for Union Pacific also argued that there should be no temporal distinction between Dr. Rabin's testimony regarding the 2016 and 2020 Light Cannon tests because Dr. Rabin noted that both versions of the test nearly equally captured persons with color vision deficiencies. This case, however, is about an employee who alleges that he *does not have any color vision deficiency* but instead was *regarded as* having such a deficiency because of his earlier failures of the Ishihara test. Thus, Walker purportedly falls within the category of persons whom Dr. Rabin tested as having a 26.5% failure rate under the original protocol—namely, persons with normal color vision. Whether the pre- and post-2020 tests could equally detect a person *with* color vision deficiencies is immaterial to Walker's allegation that he is a person *without* a color vision deficiency and that the Light Cannon test screens out people with *normal* color vision.

Although Dr. Rabin's opinion regarding the effectiveness of the Light Cannon is based on the modified 2020 test and testing protocols, like Fender's opinion it still has some probative value and is thus somewhat helpful to the jury. This is because Walker did not receive the 2016 testing protocol. Thus, Dr. Rabin may testify as to the efficacy of the 2020 Light Cannon and whether it accurately mimics actual operating or working conditions in the field.

**C.  Union Pacific's Motion Challenging Dr. Neitz**

Union Pacific moves to exclude Dr. Neitz's opinion in its entirety. Union Pacific argues that Dr. Neitz's opinions are unreliable, unhelpful, and confusing. Union Pacific first argues that Dr. Neitz mistakenly opines that the Light Cannon test *must* be validated as a scientific test instead of a field test.

Union Pacific designed the Light Cannon as a field test, not a scientific test. It is intended to match newer LED signals. As noted, the Light Cannon test is placed a quarter mile away from the examinee and the test operator turns on different lights (red, yellow, white, green), which

turn off automatically after three seconds, while a nurse records the examinee's answers. The parties, however, dispute whether the test reasonably matched actual operating or working conditions (*i.e.*, the test's validity), and that may need to be decided by the jury.

Regardless of the dispute about the validity of the Light Cannon test, the Court agrees that it is a field test and not a scientific test. Walker argues, however, that because the Light Cannon does not use any actual equipment from the field, it cannot be a field test. Walker contends that it does not accurately portray conditions in the field. That, however, goes to the "*validity*" of the field test, not to whether it *is* a field test. The Court will preclude, as irrelevant and misleading, Dr. Neitz from testifying that the Light Cannon test was required to undergo rigorous scientific study or peer review or must meet the standards of a scientific test to be a valid secondary field test.

Union Pacific also challenges the helpfulness of Dr. Neitz's opinion because he does not provide a test that *would* suffice under the regulations. Dr. Neitz, however, discusses the advantages and disadvantages of several available tests. It is unclear whether Dr. Neitz's discussion of other tests is intended as part of his opinion (it is not in his "recommendation" section), but to the extent it is, he may opine as to the strengths and weaknesses of other tests. Union Pacific may cross examine him on the fact that he does not appear to believe *any* available test is a valid or strong "secondary" test. But this goes to the weight of his opinion, not its admissibility.

Finally, Union Pacific argues that Dr. Neitz's opinion is unreliable because it relies on Dr. Rabin's 2019-20 testing regarding the Light Cannon test without considering Dr. Rabin's later deposition testimony regarding the validity of the Light Cannon test after the 2020 changes had been implemented and because Dr. Neitz has never seen the Light Cannon test. Regarding

the former argument, Dr. Neitz's testimony about the Light Cannon test after the 2020 changes were implemented has some probative value. Merely because Dr. Neitz failed to consider Dr. Rabin's deposition testimony that he believes the Light Cannon test is valid after those changes, however, does not render Dr. Neitz's opinion unreliable. Dr. Neitz differentiates in his opinion between the pre- and post-2020 Light Cannon test and protocols. Indeed, he even describes the post-2020 improvements and recites the improved study test scores. Dr. Neitz may focus on the pre-2020 test, which is more similar to the test given to Walker than the 2020 test, and Union Pacific can challenge through cross examination why Dr. Neitz did not further consider Dr. Rabin's evaluation of the Light Cannon post-changes, and whether Dr. Neitz is moved by Dr. Rabin's change of heart after the 2020 changes to the Light Cannon were implemented. This goes to weight and not admissibility.

Similarly, the fact that Dr. Neitz has never seen the Light Cannon does not render his opinion unreliable. Dr. Neitz is highly qualified regarding color vision acuity examinations, has reviewed Walker's examinations and medical records, has reviewed the 2019-20 test data about the Light Cannon, understands color vision acuity testing in general, and offers a variety of opinions that are helpful to the jury on these topics. His opinions specific to the Light Cannon test do not necessarily require that he have seen the device, because he differentiates the pre- and post- 2020 protocols and relies on the underlying data from Dr. Rabin's testing. Dr. Neitz is not improperly "parroting" the opinion of another expert, but has independently reached his own opinions, relying on the facts and data gathered by another testifying expert. This is permissible. *See, e.g.*, *United States v. Marine Shale Processors*, 81 F.3d 1361, 1370, (5th Cir. 1996) (permitting the United States' expert to testify "based on data contained in a report prepared by [a Marine Shale Processors'] expert hired in preparation for the litigation"); *San Francisco*

*Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1100-01 (N.D. Cal. 2022) (rejecting the argument that an expert could not rely on information from other testifying experts' reports); *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088-89 (N.D. Cal. 2006) (admitting expert testimony that relied on another expert's tests because "an expert is not required to testify only upon data the expert has personally gathered or tested").

Finally, Union Pacific does not specifically challenge most of Dr. Neitz's proposed testimony, other than generally to assert that because it is "based on" his misunderstanding that the Light Cannon test is not a field test, it must be excluded. The Court disagrees. Most of this unchallenged testimony is unrelated to whether the Light Cannon test must undergo vigorous scientific testing. This includes: (a) color vision acuity in general; (b) persons may not pass the primary color vision FRA test but still may safely work as a locomotive engineer or conductor because they have sufficiently color vision acuity to safely perform their duties; (c) how the majority of anomalous trichromats who fail the Ishihara can recognize and distinguish between railroad signals and the need for a valid test to separate out those who cannot; (d) Dr. Rabin's 2019-20 study demonstrated that the Light Cannon test cannot screen anomalous trichromats who are perfectly capable of reading colored signals from those who cannot; (e) Dr. Rabin's 2019-20 study showed that the Light Cannon was not a test that was reliable or valid (*e.g.*, reasonably matched actual operating or working conditions), and reinforced he and Dr. Ivan's 2016 report reaching the same conclusion; (f) a discussion of Walker's past test results, including improper grading; (g) a discussion of Walker's medical history and how it related to his color vision acuity; and (h) a description of how Walker had consistently passed the color vision tests sufficient to show adequate color acuity. The Court finds that all of this testimony is reliable and would be helpful to the jury.

**CONCLUSION**

The Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion to Exclude

Opinion Testimony of Mr. Steven Fender and Dr. Jeff Rabin, ECF 65, and Defendant's *Daubert*

Motion to Exclude the Testimony of Dr. Jay Neitz, ECF 63, as discussed in this Opinion and

Order.

**IT IS SO ORDERED**.

DATED this 19th day of December, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge